NOT DESIGNATED FOR PUBLICATION

No. 110,950

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALEJANDRO HERNANDEZ-MANRIQUE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed September 30, 2016. Affirmed.

*Rekha Sharma-Crawford*, of Sharma-Crawford Attorneys at Law, of Kansas City, Missouri, for appellant.

*Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., GREEN and BUSER, JJ.

*Per Curiam*: Alejandro Hernandez-Manrique, a Mexican national, stipulated to unlawfully using someone else's Social Security number on his W-4. The district court found him guilty of one count of identity theft and one count of making a false information. Hernandez-Manrique appeals, claiming federal law regarding employment of unauthorized aliens preempts the identity theft and false information statutes as applied to him. We disagree and affirm the conviction.

1

On May 16, 2012, Special Agent Southard of the Social Security Administration (SSA), Special Agent Suarez of Homeland Security, and Overland Park Police Detective Russell went to Bob Hamilton Plumbing looking for Hernandez-Manrique, who worked there. The Kansas Department of Labor had received a workers compensation claim for Hernandez-Manrique that included a social security number that did not lawfully belong to him. A search of the SSA masterfile database showed the SSA had issued the number to M.C.

Hernandez-Manrique was not working that day. The investigators did, however, obtain copies of his employment documents, including his W-4 and his I-9. The W-4 listed the same social security number that belonged to M.C. Hernandez-Manrique had signed the W-4 on June 1, 2010.

The investigators later found Hernandez-Manrique at his home. He admitted the social security number did not belong to him. The investigators took him into custody, and the State charged him with one count of identity theft pursuant to K.S.A. 2010 Supp. 21-4018 and one count of making a false information pursuant to K.S.A. 21-3711.

In the original complaint, the State based its charges of identity theft and making a false information on Hernandez-Manrique's I-9 form. On June 29, 2012, the State amended the complaint to refer only to his W-4 form.

On January 22, 2013, Hernandez-Manrique filed a motion to dismiss arguing federal law preempted the identity theft and false information statutes. The district court denied the motion, finding the Immigration Reform and Control Act (IRCA) did not preempt either statute.

The case went to trial on stipulated facts. Hernandez-Manrique stipulated the investigators obtained his W-4 from Bob Hamilton Plumbing, and the W-4 was the basis of his charges. The stipulated facts did not mention his I-9.

The district court found Hernandez-Manrique guilty on both counts and sentenced him to 18 months' probation with an underlying prison term of 8 months.

On appeal, Hernandez-Manrique argues for the first time that these statutes are unconstitutional as applied. He offers no explanation as to why we should hear his argument for the first time on appeal. The State argues Hernandez-Manrique did not raise this issue at the district court level. He did file a motion to dismiss, arguing that federal law preempted K.S.A. 2010 Supp. 21-4018 and K.S.A. 21-3711. He argued, however, the statutes were invalid on their face because they created a state penalty for a federal crime.

Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). This rule is not absolute, however, and there are several exceptions when a litigant may assert a new legal theory for the first time on appeal, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

While a litigant may raise a constitutional issue on appeal, briefing rules also require the litigant to explain why we should hear the issue for the first time. Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) requires an appellant to explain why an appellate court should consider an issue he or she did not raise below for the first time

3

on appeal. Litigants who fail to comply with this rule risk a ruling that they have improperly briefed the issue, and thus it has been waived or abandoned. *Godfrey*, 301 Kan. 1041, Syl. (Rule 6.02[a][5] will henceforth be strictly enforced); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014) (cautioning future litigants to comply with Rule).

As noted above, Hernandez-Manrique does not explain in his brief why we should hear his argument for the first time on appeal. His argument could possibly apply under the first exception, except he wishes us to rely on facts that the district court did not find. His as applied argument may also qualify for the second exception. Even though he did not comply with Supreme Court Rule 6.02(a)(5), we will address the merits of the issue.

"Preemption is a question of law over which this court exercises de novo review." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011).

The Supremacy Clause of the United States Constitution establishes the doctrine of federal preemption, stating: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, paragraph 2. Under federal preemption, state laws that interfere with or conflict with federal laws are invalid. *Miami County*, 292 Kan. at 294. To determine whether a federal law preempts state law, we must consider Congress' intent by looking at the federal statute's language and framework. *Wichita Terminal Ass'n v. F.Y.G. Investments, Inc.*, 48 Kan. App. 2d 1071, 1078, 305 P.3d 13 (2013) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86, 116 S. Ct. 2240, 135 L. Ed. 2d 700 [1996]). We also assume that "'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of

4

Congress.' [Citations omitted.]" *Arizona v. United States*, 567 U.S., ___, 132 S. Ct. 2492, 2501, 183 L. Ed. 2d 351 (2012).

There are two primary categories of preemption: express preemption and implied preemption. Implied preemption also has two subcategories: field preemption and conflict preemption. *Miami County*, 292 Kan. at 294. While Hernandez-Manrique's brief does not clearly state which forms of preemption Congress intended with the IRCA, he appears to argue all three.

The State primarily argues that federal law does not preempt the statutes at issue because they are facially neutral and are not targeted at immigration violations. While this argument would be relevant to a facial challenge, it does not address the nature of Hernandez-Manrique's specific as applied challenge.

First, Hernandez-Manrique argues the IRCA preempts state criminal investigations and prosecutions which rely on the I-9 form, and express preemption language supports his argument. Express preemption applies when Congress makes its intent known through explicit statutory language. *Miami County*, 292 Kan. at 295. In analyzing an express preemption clause, we "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993).

In the case of the IRCA, express preemption language is found in 8 U.S.C. § 1324a(b)(5) (2012), which states, "A form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18." Based on the language in § 1324a(b)(5), panels of this court have found Congress intended to preempt states from

5

establishing criminal penalties related to employment-related verification of immigration status. See *State v. Ochoa-Lara*, 52 Kan. App. 2d 86, 91, 362 P.3d 606 (2015). More specifically, this court has found the IRCA "prohibits a state from prosecuting a defendant for putting false information on an I-9 or other federal employment eligibility form." *State v. Lopez-Navarrete*, No. 111,190, 2014 WL 7566851, at *3 (Kan. App. 2014) (unpublished opinion); see also *State v. Reynua*, 807 N.W.2d 473, 478-80 (Minn. App. 2011) (finding state perjury prosecution based on false statements made on I-9 form preempted by IRCA).

As the *Ochoa-Lara* court has noted, the identity theft and false information statutes under which Hernandez-Manrique was convicted have nothing "to do with employment-related verification of immigration status, nor do they create criminal penalties for unauthorized aliens working or seeking work in Kansas." 52 Kan. App. 2d at 91. The identity theft statute, K.S.A. 2010 Supp. 21-4108, prohibits "obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with intent to defraud that person, or anyone else, in order to receive any benefit." The false information statute, K.S.A. 21-3711, prohibits

> "making, generating, distributing or drawing, or causing to be made, generated, distributed or drawn, any written instrument, electronic data or entry in a book of account with knowledge that such information falsely states or represents some material matter or is not what it purports to be, and with intent to defraud, obstruct the detection of a theft or felony or induce official action."

As Hernandez-Manrique himself admits, neither of these statutes are in conflict with federal law on their face.

In his as-applied challenge, Hernandez-Manrique instead focuses on the use of the I-9 form. He argues that not only does the IRCA preempt state prosecutions based on the

6

I-9, it also preempts state criminal *investigations* which rely on the I-9. In support of his argument, Hernandez-Manrique relies heavily on an amicus curiae brief filed by the United States in a 9th Circuit Court of Appeals case. He did not provide a copy of the amicus brief with his brief.

The United States filed the amicus brief Hernandez-Manrique relies on in relation to the case *Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016). In *Puente Arizona*, an immigrant advocacy organization was challenging an Arizona identity theft law that prohibited using a false identity to obtain employment. The district court found federal law preempted the Arizona law and granted a preliminary injunction preventing the Arizona government from enforcing it. The Ninth Circuit overturned the district court on appeal, finding that "[a]lthough there is tension between the federal scheme and some applications of the identity theft laws, . . . this tension is not enough to rise to the level of a 'clear and manifest purpose' to preempt the identity theft laws in their entirety." 821 F.3d at 1105.

The *Puente Arizona* court acknowledged that "some applications of the identity theft laws may come into conflict with IRCA's 'comprehensive scheme' or with the federal government's exclusive discretion over immigration-related prosecutions." 821 F.3d at 1107. The court also noted that "the district court may ultimately decide to enjoin identity theft enforcement actions which rely on I-9 documents." 821 F.3d at 1108. Ultimately, though, the court stressed its decision was limited to a facial challenge to the identity theft laws, and it made "no comment on the viability of [the organization's] as applied challenge still pending in the district court." 821 F.3d at 1108.

Hernandez-Manrique's brief contains an extensive quote from the United States' amicus brief filed in *Puente Arizona*. In this quote, the United States argues that not only does federal law preempt states from using an I-9 form in criminal prosecutions, federal law also preempts states from using the I-9 in criminal investigations as well.

Furthermore, the United States argues that federal law preempts the statutes at issue in *Puente Arizona* "to the extent they regulate fraud committed to demonstrate authorization to work in the United States under federal immigration law."

Amicus briefs are not binding legal authority, and there do not appear to be any state or federal cases in which a court has addressed whether state and local officials may use an I-9 as part of a criminal investigation. Looking at its plain wording, however, the IRCA likely preempts state and local officials from even using an I-9 form in a criminal investigation. Title 8 U.S.C. § 1324a(b)(5) clearly states the I-9 may not be used for any purpose other than enforcement of the IRCA. Additionally, under 8 U.S.C. § 1324a(d)(2)(F)(2012), the IRCA's work authorization system "may not be used for law enforcement purposes, other than for enforcement of this chapter or sections 1001, 1028, 1546, and 1621 of Title 18." Reading these two provisions together, the IRCA likely preempts state criminal investigations which rely on I-9 forms.

While Hernandez-Manrique may have the merits of this argument, it does not appear to help his particular case. Based on the facts of his case, investigators did not rely on an I-9 form. Hernandez-Manrique stipulated that the investigators became aware of his unlawful use of M.C.'s social security number through a workers compensation claim. The investigators then obtained a copy of his W-4, which was the basis of his conviction. The affidavit of probable cause states that the investigators also acquired a copy of Hernandez-Manrique's I-9 from his employer, and the original complaint based his charges on his I-9. The district court did not make any factual findings as to the use of his I-9, however, and we do not make factual findings. See *State v. Estrada-Vital*, 302 Kan. 549, 555, 356 P.3d 1058 (2015) ("[A]ppellate courts do not make their own factual findings. Rather, appellate courts only review those factual findings which have been made by the district courts."). Thus, Hernandez-Manrique has no as applied challenge based on the State's use of his I-9.

8

Even if the district court had made factual findings as to Hernandez-Manrique's I-9, the State's use of his I-9 in this case does not appear to be unconstitutional. He argues using an I-9 even as part of a criminal investigation is unconstitutional. He explains his argument by analogizing to the fruit of the poisonous tree doctrine:

> "The fruit of the poisonous tree doctrine not only bars the admission of evidence directly seized during an illegal search but also any evidence obtained indirectly as a result of information learned or leads obtained from the illegal search. Moreover, evidence that is sufficiently distinguishable so as to be purged of the primary taint is not considered fruit of the poisonous tree."

He argues the same should be true for the I-9, since the State may not use the I-9 in state criminal prosecutions, the State may also not use any information or leads obtained from an I-9.

Whatever merits this argument may have, Hernandez-Manrique's case is not the appropriate vehicle. Looking at the record on appeal, the investigators did not use his I-9 to obtain information or leads that were not otherwise available to them. A workers compensation claim, not an I-9, tipped off investigators to Hernandez-Manrique's unlawful use of M.C.'s social security number. Investigators then obtained copies of both his I-9 and his W-4 from his employer. The investigators did or could have discovered the W-4 by means wholly independent of the I-9; thus, the W-4 is not "fruit of the poisonous tree." See *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984) ("The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."); *State v. Canaan*, 265 Kan. 835, 845, 964 P.2d 681 (1998) (applying independent source doctrine).

Hernandez-Manrique additionally asks us to review the specific facts of his case while simultaneously arguing that the stipulated facts should not limit us. In an as applied challenge, however, facts are critical to our analysis. See, *e.g.*, *Joe Self Chevrolet, Inc. v.*

*Board of Sedgwick County Comm'rs*, 247 Kan. 625, 637, 802 P.2d 1231 (1990) ("A statute may be constitutional as applied to one set of facts and unconstitutional as applied to another."). Furthermore, as noted above, we do not make factual findings, and thus we are limited to the facts the district court established.

Perhaps as a way around the particular facts of his case, Hernandez-Manrique also appears to argue that the IRCA preempts state criminal investigations or prosecutions based on *any* federal document related to employment. This would of course apply to him because the W-4 is a federal form. This court, however, has explicitly distinguished the W-4 from federal forms or documents related to verifying an immigrant's employment eligibility. The W-4 only "directs an employer to withhold federal income tax from an employee's pay." *Lopez-Navarette*, 2014 WL 7566851 at *3. Additionally, there do not appear to be any federal appellate cases in which the federal government has charged anyone with obtaining employment through fraudulent means based on information provided on a W-4.

Even Hernandez-Manrique's primary authority for his brief, the United States amicus brief, does not appear to support this contention. As stated in the portion of the United States amicus brief which Hernandez-Manrique quotes, federal law preempts state statues "to the extent they regulate fraud committed to demonstrate authorization to work in the United States under federal immigration law." The W-4 is not a document used to demonstrate work authorization under federal immigration law. Hernandez-Manrique does not provide any other authority that federal immigration law preempts state criminal prosecutions for information provided on federal tax documents.

In conclusion, while the IRCA does appear to expressly preempt state criminal prosecutions which in any way rely on I-9 forms, there is no authority that the IRCA similarly preempts the use of any federal employment document. Furthermore, the

10

investigators in Hernandez-Manrique's case did not rely on an I-9 in their investigation. His as applied challenge fails on this point.

Hernandez-Manrique also contends his prosecution under Kansas' identity theft and false information laws intrudes on a field in which only the federal government may legislate. Under the doctrine of field preemption,

> "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance. . . . The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. [Citations omitted.] '" *Arizona*, 132 S. Ct. at 2501

With the IRCA, Congress enacted a comprehensive framework to combat the employment of unauthorized aliens. *Arizona*, 132 S. Ct. at 2504. As the United States Supreme Court explained, this framework

> "makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers. See 8 U.S.C. §§ 1324a(a)(1)(A), (a)(2). It also requires every employer to verify the employment authorization status of prospective employees. See §§ 1324a(a)(1)(B), (b); 8 CFR § 274a.2(b) (2012). These requirements are enforced through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions. See 8 U.S.C. §§ 1324a(e)(4), (f); 8 CFR § 274a.10.

> "This comprehensive framework does not impose federal criminal sanctions on the employee side (*i.e.*, penalties on aliens who seek or engage in unauthorized work) [but] some civil penalties are imposed instead. . . . In addition to specifying these civil consequences, federal law makes it a crime for unauthorized workers to obtain employment through fraudulent means. See 18 U.S.C. § 1546(b)." 132 S. Ct. at 2504.

11

The IRCA is arguably so expansive as to preclude the enactment of state laws regarding the employment of unauthorized aliens.

In facial challenges to the identity theft and false information statutes, however, Kansas courts have routinely held these statutes do not encroach upon this field. See, *e.g., Ochoa-Lara*, 52 Kan. App. 2d at 90-91; *State v. Garcia*, No. 112,502, 2016 WL 368054, at *3-4 (Kan. App. 2016) (unpublished opinion). While facial challenges differ from as applied challenges, the courts in these opinions stressed that the individual defendants were not prosecuted for immigration violations. For example, the *Lopez-Navarrete* court explained,

> "Lopez-Navarrete was not prosecuted for a false statement on her I-9 form or any other federal document related to verifying an immigrant's employment eligibility; the only federal form that supported her conviction was a W-4, which directs an employer to withhold federal income tax from an employee's pay. Her conviction herein does not consider her immigration status, the lawfulness of her presence within the United States, or her employment eligibility." 2014 WL 7566851, at *3.

Like *Lopez-Navarette*, these opinions emphasize that the defendant's conviction was not based on work authorization documents and was unrelated to any violation of federal immigration law. *Ochoa-Lara*, 52 Kan. App. 2d at 90-91; *Garcia*, 2016 WL 368054 at *4.

Hernandez-Manrique asserts that despite the facial neutrality of these statutes, the State of Kansas is applying them "in a systematic and precise manner that intrudes upon an area reserved to the federal government alone." He argues that all the cases which have raised a federal preemption argument, including his, are factually similar: federal agents obtained work verification documents about an individual who obtained work in Kansas using false information; federal agents drove the prosecution, often being the only investigators or witnesses; and every prosecution led to the institution of removal

12

proceedings. In support of his argument, Hernandez-Manrique cites to a number of unpublished cases, none of which he includes with his brief as required by Supreme Court Rule 7.04 (2015 Kan. Ct. R. Annot. 64). He also cites to a district court case record, which he also fails to include in the record on appeal.

Hernandez-Manrique has taken significant poetic license in describing the factual scenarios of these opinions. Most, but not all, of these cases, as described in the opinions, involved federal agents in the investigation. *Ochoa-Lara*, 52 Kan. App. 2d at 87 (local police officers and immigration agents investigated defendant); *State v. Garcia*, 2016 WL 368054, at *1 (local police officer originally investigated defendant, then called SSA agent); *State v. Dorantes*, No. 111,224, 2015 WL 4366452, at *1 (Kan. App. 2015) (unpublished opinion) (local police officer investigated defendant); *Lopez Navarrete*, 2014 WL 7566851, at *1 (local police officer and SSA agent investigated defendant); *State v. Flores-Sanchez*, No. 110,457, 2014 WL 7565673, at *1 (Kan. App. 2014) (unpublished opinion) (does not mention whether investigators were local or federal). Two opinions establish that a federal agent testified at trial. *State v. Morales*, No. 111,904, 2016 WL 97848, at *1 (Kan. App. 2016) (unpublished opinion); *State v. Saldana*, No. 111,429, 2015 WL 4486779, at *1 (Kan. App. 2015) (unpublished opinion). None of the opinions make it clear that the federal agents "drove" the investigation, however, and none of them even mention removal proceedings. Furthermore, none of these facts were established at the district court level in this case.

Hernandez-Manrique also argues that the legislative history of the Kansas statute demonstrates the Kansas Legislature did not intend for the statute to target undocumented workers. He provides an extensive recitation of the legislative history of identity and false information laws in Kansas but does not include any of the relevant documents with his brief. The history of this bill hurts rather than helps his argument, though. Hernandez-Manrique goes to great lengths to demonstrate the Kansas Legislature intended for these

statutes to apply to identity thieves and those who commit fraud, not unauthorized immigrant workers.

Of course, legislative intent is not dispositive in preemption cases. *Puente Arizona*, 821 F.3d at 1106. In a field preemption analysis, "'part of the field . . . is defined by reference to the purpose of the state law in question, . . . another part of the field is defined by the state law's actual effect.'" *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 105, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992). Rather than argue the State's actions are impermissible because they go beyond the scope of the legislature's intent, the more prudent argument for Hernandez-Manrique is that the actual effect of the state law intrudes on a field preempted by federal law. Hernandez-Manrique does make this argument, but, as noted above, the record does not demonstrate that the law is having the effect Hernandez-Manrique claims it does, because these facts were not established at the district court level. See *Puente Arizona*, 821 F.3d at 1106 (considering actual effect of identity theft law based on evidence in record).

Hernandez-Manrique also claims that "fraud committed in an effort to work is intrinsically tied to immigration matters and therefore must be addressed under federal law." In support of his argument, he cites *Flores-Figueroa v. United States*, 556 U.S. 646, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009). In *Flores-Figueroa*, the United States Supreme Court held that under the federal aggravated identity theft statute, a defendant had to know that the means of identification he or she used actually belonged to another person. 556 U.S. 647. In that case, the defendant originally gave his employer a false social security number and a counterfeit alien registration card, neither of which belonged to a real person. Six years later, he presented his employer with new counterfeit social security and alien registration cards. The cards used his real name, but the numbers on the cards belonged to other people. The United States charged the defendant with "entering the United States without inspection, 8 U.S.C. § 1325(a), . . . misusing immigration

14

documents, 18 U.S.C. § 1546(a) [and] aggravated identity theft, 18 U.S.C. § 1028A(a)(1)."

This case does not support Hernandez-Manrique's argument that "fraud committed in an effort to work" and immigration are inherently linked and thus must be addressed under federal law. First, the defendant in this case clearly presented fraudulent documents in an effort to demonstrate work eligibility, which is a federal crime. See 18 U.S.C. § 1546 (2012). Second, this case does not mention any other federal document filed merely in an "effort to work" rather than in an effort to demonstrate work eligibility. Thus, there is no authority in this case to extend preemption regarding work authorization to documents such as a W-4, which is a federal tax document. Furthermore, this case arguably demonstrates that misuse of immigration documents and identity theft are separate crimes, and the latter is not subsumed by regulation of the former. The federal identity theft statute is not part of the IRCA or an immigration law code. Misuse of immigration documents is a predicate crime of federal identity theft, but it is one of several other predicate crimes, including numerous crimes unrelated to immigration. See 18 U.S.C. § 1028A(c) (2012).

In further support of this argument, Hernandez-Manrique goes on to quote *Arizona v. United States*. In the section of the opinion he quotes, the Supreme Court notes that even if a state law is aimed at furthering the goals of a federal law, it may still be preempted. This quote is not persuasive in this case. In *Arizona*, the Supreme Court was considering a state statute that imposed a state penalty for violations of a federal law. Arizona passed a law making it a misdemeanor to willfully fail to complete or carry an alien registration document in violation of 8 U.S.C. § 1304(e) or 1306(a) (2012). Since Congress has occupied the field of alien registration, the Arizona state law was clearly preempted, regardless of whether it had the same aim or substantive standards as federal law. 132 S. Ct. at 2502-03.

Ultimately, Hernandez-Manrique's argument appears to be that with the IRCA, Congress preempted the field of work authorization for immigrants. Because Congress has preempted the field of work authorization for immigrants, it also preempted any "employment formalities" necessary to complete the hiring process because this area of conduct is closely related to work authorization. Whether an area of conduct is related to a preempted field is not the standard for preemption, however. The standard is whether Congress intended to preempt that area of conduct. Hernandez-Manrique is unable to provide any authority that Congress intended to preempt all employment-related conduct of immigrant workers. Without evidence of Congress' clear and manifest intent, criminal conduct related to employment should stay within the state's historic police powers.

Finally, Hernandez-Manrique argues federal law preempts the Kansas identity theft and false information statutes because they are an obstacle to the policy objectives of the IRCA. Federal law may preempt state law when the two conflict. This includes both instances where "'compliance with both federal and state regulations is a physical impossibility,'" and instances where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 132 S. Ct. at 2501.

While the overall purpose of the IRCA was to "combat the employment of illegal aliens,"

> "The legislative background of IRCA underscores the fact that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment. . . . Proposals to make unauthorized work a criminal offense were debated and discussed during the long process of drafting IRCA. . . . But Congress rejected them. . . . IRCA's framework reflects a considered judgment that making criminals out of aliens engaged in unauthorized work—aliens who already face the possibility of employer exploitation because of their removable status—would be inconsistent with federal policy and objectives." *Arizona*, 132 S. Ct. at 2504.

16

While Congress was reluctant to create criminal penalties for unauthorized work, they still created federal laws which made it a crime to use fraudulent means to demonstrate work authorization. See 18 U.S.C. § 1546.

A state statute that creates criminal penalties for aliens engaged in unauthorized work clearly stands as an obstacle to the purposes and objectives of the IRCA. The Supreme Court found as much in *Arizona*, 132 S. Ct. at 2504-05. There, Arizona had passed a law making it a misdemeanor for an unauthorized alien to apply or perform work in the state. The Supreme Court held that such a statute posed an obstacle to the purposes and objectives of the IRCA and was thus preempted. 132 S. Ct. at 2505.

The Kansas identity theft and false information statutes do not present this same glaring obstacle. Both statutes criminalize fraud that is not necessarily related to immigration or work authorization. In the case of defendants like Hernandez-Manrique, however, that fraud is connected to work eligibility. See, *e.g.*, *Garcia*, 2016 WL 368054 at *2 (defendant acted with intent to defraud under identity theft statute because he "induced his potential employer to believe he was eligible to be employed by using a stolen social security number on his W-4"). Thus, "there is tension between the federal scheme and some applications of [these] laws." *Puente Arizona*, 821 F.3d at 1105. Tension is not enough to demonstrate preemption, however. In the case of traditional police powers such as criminal law, Congress' intent to preempt must be "clear and manifest." 821 f3d at 1105.

The Kansas Court of Appeals has held that the intent of Congress was to preempt the area of employment-related verification of immigration status, and prosecutions like Hernandez-Manrique's are not included in that preemption. In *Ochoa-Lara*, the defendant had used a social security number lawfully belonging to another person to fill out a W-4.

17

He was convicted of identity theft. On appeal, he argued the IRCA preempted the Kansas identity theft statute. While his challenge was a facial challenge, the court noted,

> "Neither the current nor former Kansas identity theft statutes have anything to do with the employment-related verification of immigration status, nor do they create criminal penalties for unauthorized aliens working or seeking work in Kansas. . . . The gravamen of the offenses for which Ochoa-Lara was prosecuted are the unauthorized uses of another person's Social Security number. *There is nothing in the IRCA or its express preemption language that remotely suggests that Congress intended to supersede Kansas' historic police power to prosecute identity thieves.*" (Emphasis added). 52 Kan. App. 2d at 91.

In summary, Hernandez-Manrique is likely correct that certain provisions of the IRCA expressly preempt state criminal prosecutions that in any way rely on the I-9. This is not helpful in this case, however, as the State did not rely on the I-9 in its investigation or prosecution of Hernandez-Manrique. Moreover, there is no authority to suggest that federal law similarly preempts the use of the W-4, as the W-4 is a tax withholding document and not part of the work authorization system established by the IRCA.

The IRCA also likely occupies the field work authorization for immigrants. Again, however, the State prosecuted Hernandez-Manrique for identity theft and making a false information related to false information on a W-4. His conviction was unrelated to immigrant work authorization. Thus, it did not infringe on a field reserved for the federal government.

Finally, there is arguably some tension between the IRCA's policy of not providing criminal penalties for immigrants performing unauthorized work and prosecuting unauthorized workers for identity theft and false information in relation to employment documents. In order to preempt the state's historic police powers, however, Congress' intent to do so must be clear and manifest. There is nothing in the IRCA to

clearly demonstrate Congress intended to preempt the state's ability to regulate criminal activity related to employment that is not otherwise preempted.

Affirmed.